## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and )<br>INTELLECTUAL VENTURES II LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. 13-1274-SLR |
| ) | |
| MANUFACTURERS AND TRADERS ) | |
| TRUST COMPANY, ) | |
| ) | |
| Defendants. ) | |

Brian E. Farnan, Esquire of Farnan LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Margaret Elizabeth Day, Esquire, Ian N. Feinberg, Esquire, David L. Alberti, Esquire, Sal Lim, Esquire, Yakov Zolotorev, Esquire, and Marc Belloli, Esquire of Feinberg Day Alberti & Thompson LLP.

Chad M. Shandler, Esquire and Travis S. Hunter, Esquire of Richards Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendant. Of Counsel: Frank M. Gasparo, Esquire, Todd M. Nosher, Esquire, and William D. Coston, Esquire of Venable LLP.

## MEMORANDUM OPINION

Dated: December 18, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On July 24, 2013, plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "plaintiffs") filed a complaint against defendant Manufacturers and Traders Trust Company ("defendant") alleging direct and indirect infringement of U.S. Patent Nos. 7,664,701 ("the '701 patent"), 8,083,137 ("the '137 patent"), 7,603,382 ("the '382 patent"), 7,260,587 ("the '587 patent") (collectively, "the patents-in-suit"), and 6,182,894 ("the '894 patent"). (D.I. 1) After defendant filed a motion to dismiss, plaintiffs filed an amended complaint on November 15, 2013, including additional allegations regarding indirect infringement and withdrawing the claims based on the '894 patent. (D.I. 14) Presently before the court is defendant's motion to dismiss the amended complaint. (D.I. 16) The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

Plaintiffs are Delaware limited liability companies having a principal place of business in Bellevue, Washington. (D.I. 14 at ¶¶2-3) Defendant is a New York corporation with its principal place of business in Buffalo, New York. (Id. at 4)

The '137 patent, titled Administration of Financial Accounts, was filed May 26, 2009 and issued December 27, 2011. The '382 patent, titled Advanced Internet Interface Providing User Display Access of Customized Webpages, was filed November 5, 2004 and issued October 13, 2009. The '587 patent, titled Method for Organizing Digital Images, was filed December 22, 2003 and issued August 21, 2007. The '701 patent, titled Masking Private Billing Data by Assigning Other Billing Data to Use in

Commerce with Businesses, was filed November 1, 2006 and issued February 16, 2010.[1]

## III. STANDARD OF REVIEW

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual

---

[1]Defendant's briefing cites several cases involving the patents-in-suit. In *Intellectual Ventures I LLC v. Capital One Financial Corp.*, Civ. No. 13-740, 2014 WL 1513273 (E.D. Va. April 16, 2014), the court concluded that the '137 and '382 patents were invalid for lack of patentable subject matter. The remaining cases involving the patents-in-suit are stayed pending review of the patents-in-suit by the U.S. Patent and Trademark Office: Civ. No. 13-378, S.D. Ohio; Civ. No. 13-358, W.D.N.C.; Civ. No. 13-740, W.D. Pa.; and, Civ. No. 13-5386, S.D.N.Y. (also stayed pending the appeal in *Intellectual Ventures I LLC v. Capital One Financial Corp.*).

allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## IV. DISCUSSION

### A. Standard

The standard of proof to establish the invalidity of a patent is "clear and convincing evidence." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1058 (Fed. Cir. 2004); *see also, Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338-39 (Fed. Cir. 2013), vacated sub nom. *WildTangent, Inc. v. Ultramercial, LLC*, —— U.S.

3

——, 134 S.Ct. 2870 (2014). Whether a claim is drawn to patent-eligible subject

matter under 35 U.S.C. § 101 is a threshold inquiry to be determined as a matter of law

in establishing the validity of the patent. *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717

F.3d 1269, 1277 (Fed. Cir. 2013), *aff'd, Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, — U.S.

—, 134 S.Ct. 2347 (2014); *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008) (citing *In re*

*Comiskey*, 499 F.3d 1365, 1371 (Fed. Cir. 2007)) ("*Bilski I*"). Section 101 provides that

patentable subject matter extends to four broad categories, including: "new and useful

process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101;

*see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (" *Bilski II* "); *Diamond v.*

*Chakrabarty*, 447 U.S. 303, 308 (1980). A "process" is statutorily defined as a "process,

art or method, and includes a new use of a known process, machine manufacture,

composition of matter, or material." 35 U.S.C. § 100(b). The Supreme Court has

explained:

> A process is a mode of treatment of certain materials to produce a given
> result. It is an act, or a series of acts, performed upon the subject-matter
> to be transformed and reduced to a different state or thing. If new and
> useful, it is just as patentable as is a piece of machinery. In the language
> of the patent law, it is an art. The machinery pointed out as suitable to
> perform the process may or may not be new or patentable; whilst the
> process itself may be altogether new, and produce an entirely new result.
> The process requires that certain things should be done with certain
> substances, and in a certain order; but the tools to be used in doing this
> may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 182–83 (1981) (internal quotations omitted).

The Supreme Court recognizes three "fundamental principle" exceptions to the

Patent Act's subject matter eligibility requirements: "laws of nature, physical

4

phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601.  The Supreme Court has

held that "[t]he concepts covered by these exceptions are 'part of the storehouse of

knowledge of all men ... free to all men and reserved exclusively to none.'" *Bilski II*, 561

U.S. at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130

(1948)).  "[T]he concern that drives this exclusionary principle is one of pre-emption,"

that is, "'that patent law not inhibit further discovery by improperly tying up the future

use of' these building blocks of human ingenuity." *Alice,* 134 S.Ct. at 2354 (citing *Bilski*

*II*, 561 U.S. at 611-12 and *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 566

U.S. —, 132 S.Ct. 1289, 1301 (2012)).

Although a fundamental principle cannot be patented, the Supreme Court has

held that "an **application** of a law of nature or mathematical formula to a known

structure or process may well be deserving of patent protection," so long as that

application would not preempt substantially all uses of the fundamental principle. *Bilski*

*II*, 561 U.S. at 612 (quoting *Diehr*, 450 U.S. at 187) (internal quotations omitted); *Bilski I*,

545 F.3d at 954.  The Supreme Court recently reiterated the

framework for distinguishing patents that claim laws of nature, natural
phenomena, and abstract ideas from those that claim patent-eligible
applications of those concepts.  First, we determine whether the claims at
issue are directed to one of those patent-ineligible concepts.  If so, we
then ask, "[w]hat else is there in the claims before us?"  To answer that
question, we consider the elements of each claim both individually and "as
an ordered combination" to determine whether the additional elements
"transform the nature of the claim" into a patent-eligible application. We
have described step two of this analysis as a search for an "'inventive
concept'"—i.e., an element or combination of elements that is "sufficient to
ensure that the patent in practice amounts to significantly more than a
patent upon the [ineligible concept] itself."

5

*Alice Corp.*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1294, 1296-98).[2] "[T]o transform an unpatentable law of nature into a patent-eligible **application** of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Mayo*, 132 S.Ct. at 1294 (citing *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972)). It is insufficient to add steps which "consist of well-understood, routine, conventional activity," if such steps, "when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Id.* at 1298. "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law." *Id.* (citations omitted). Also, the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'" *Bilski II*, 561 U.S. at 610-11 (citation omitted). For instance, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (citations omitted).

---

[2]The machine-or-transformation test still may provide a "useful clue" in the second step of the *Alice* framework. *Ultramercial, Inc. v. Hulu, LLC*, Civ. No. 2010–1544, 2014 WL 5904902, at *6 (Fed. Cir. November 14, 2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C., v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). A claimed process can be patent-eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), *aff'd on other grounds*, *Bilski II*, 561 U.S. 593.

The court finds the comparison of *Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266 (Fed. Cir. 2012), to *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), instructive. In *Bancorp*, where the asserted patents disclosed "specific formulae for determining the values required to manage a stable value protected life insurance policy," the district court granted summary judgment of invalidity under § 101. *Bancorp*, 687 F.3d at 1270. Under the machine prong of the machine or transformation test, the district court found that "the specified computer components are no more than objects on which the claimed methods operate, and that the central processor is nothing more than a general purpose computer programmed in an unspecified manner." *Id.* at 1273. In affirming the district court's findings, the Federal Circuit explained that

the use of a computer in an otherwise patent-ineligible process for no more than its most basic function - making calculations or computations - fails to circumvent the prohibition against patenting abstract ideas and mental processes. As we have explained, "[s]imply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012).

To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not.

*Id.* at 1278. Ultimately, the Federal Circuit concluded that "[t]he computer required by some of Bancorp's claims is employed only for its most basic function, the performance of repetitive calculations, and as such does not impose meaningful limits on the scope of those claims." *Id.* at 1278.

In contrast to *Bancorp*, the Federal Circuit in *SiRF* found that a GPS receiver was "integral" to the claims at issue and, therefore, the machine or transformation test

7

was satisfied. *SiRF*, 601 F.3d at 1332. As in *Bancorp*, the *SiRF* Court emphasized that a machine will only "impose a meaningful limit on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Id.* at 1333. After noting how the GPS receiver was specifically involved in each step of the method, the Court concluded that "the use of [the] GPS receiver is essential to the operation of the claimed methods." *Id.*

In sum, although it is "clear that computer-based programming constitutes patentable subject matter so long as the basic requirements of [35 U.S.C.] § 101 are met," *AT&T*, 172 F.3d at 1360, the requirements of § 101 as applied to this area of technology have been a moving target, from the complete rejection of patentability for computer programs[3] to the much broader enunciation of the test in *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998), *abrogated by In re Bilski*, 545 F.3d 943., that is, "a computer-implemented invention was considered patent-eligible so long as it produced a 'useful, concrete and tangible result.'" *DDR Holdings, LLC v. Hotels.Com, L.P.,* Civ. No. 2013–1505, 2014 WL 6845152, at *10 (Fed. Cir. Dec. 5, 2014). As instructed by the Federal Circuit in *DDR Holdings,* the Court's most recent attempt to bring clarity to this area of the law: (1) "recitation of generic computer limitations does not make an otherwise ineligible claim patent-

---

[3]*See, e.g.,* 33 Fed. Reg. 15581, 15609-10 (1968). Indeed, in his dissent in *Diamond v. Diehr*, 450 U.S. 175 (1981), Justice Stevens's solution was to declare all computer-based programming unpatentable. *Id.* at 219.

eligible," *id.* at *9; (2) "mathematical algorithms, including those executed on a generic

computer, are abstract ideas," *id.*; (3) "some fundamental economic and conventional

business practices are also abstract ideas," *id.*; and (4) general use of the Internet "to

perform an abstract business practice (with insignificant added activity)" does not pass

muster under § 101, *id.* at *12. In order for claims addressing "Internet-centric

challenges" to be patent eligible,[4] the claims must do more than

> recite a commonplace business method aimed at processing business
> information, applying a known business process to the particular
> technological environment of the Internet, or creating or altering
> contractual relations using generic computer functions and conventional
> network operations, such as the claims in *Alice, Ultramercial, buySAFE,
> Accenture,* and *Bancorp.*

*Id.* (citing *Alice,* 134 S.Ct. at 2359; *Ultramercial,* 2014 WL 5904902, at *5, *buySAFE,

Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *Accenture Global Servs.,

GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344-45 (Fed. Cir. 2013); *Bancorp*,

687 F.3d at 1278).

## B. Analysis

### 1. Claim Construction

The Federal Circuit has "never set forth a bright line rule requiring district courts

to construe claims before determining subject matter eligibility." *Ultramercial, LLC v.

Hulu, LLC*, 657 F.3d 1323, 1325 (Fed. Cir. 2011), *vacated sub nom. WildTangent*, 132

S.Ct. 243. "[B]ecause eligibility is a 'coarse' gauge of the suitability of broad subject

---

[4] Although the court understands that the advent of the Internet inspired
countless inventive ways of accomplishing routine tasks better, faster, cheaper –
indeed, both the PTO and the Federal Circuit considered such ingenuity sufficiently
inventive under § 101 to be patent eligible – apparently such is not the case under the
current legal reasoning.

matter categories for patent protection, *Research Corp. Techs., Inc. v. Microsoft Corp.*,

627 F.3d 859, 869 (Fed. Cir. 2010), claim construction may not always be necessary for

a § 101 analysis." *Ultramercial*, 657 F.3d at 1325 (citing *Bilski II*, 130 S.Ct. at 3231

(finding subject matter ineligible for patent protection without claim construction)). In

*Bancorp*, the Federal Circuit reiterated that "claim construction is not an inviolable

prerequisite to a validity determination under § 101, but is "ordinarily . . . desirable—and

often necessary—to resolve claim construction disputes prior to a § 101 analysis, for

the determination of patent eligibility requires a full understanding of the basic

character of the claimed subject matter." *Bancorp*, 687 F.3d at 1273-74. In advocating

for judicial efficiency, the Federal Circuit recently stated:

> From a practical perspective, addressing section 101 at the outset of
> litigation will have a number of salutary effects. First, it will conserve
> scarce judicial resources. Failure to recite statutory subject matter is the
> sort of "basic deficiency," that can, and should, "be exposed at the point of
> minimum expenditure of time and money by the parties and the court,"
> *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citations and
> internal quotation marks omitted). Here, for example, the district court
> properly invoked section 101 to dismiss Ultramercial's infringement suit on
> the pleadings. No formal claim construction was required because the
> asserted claims disclosed no more than "an abstract idea garnished with
> accessories" and there was no "reasonable construction that would bring
> [them] within patentable subject matter." *Ultramercial, LLC v. Hulu, LLC*,
> No. 09–CV–6918, 2010 WL 3360098, at *6 (C.D. Cal. Aug. 13, 2010).

*Ultramercial*, 2014 WL 5904902, at *8.

Plaintiffs advocate that "the claims, consistent with [plaintiffs'] arguments . . . ,

require specific technology to practice the patents and therefore are patent eligible."

(D.I. 18 at n.3) Plaintiffs' arguments throughout the briefing make no mention of how

the construction of certain limitations would inform the § 101 analysis. The court

10

concludes that it may proceed on a § 101 analysis, as the parties' arguments are not focused on specific claim limitations, but instead on the broader concepts of the claims and the computer components used.

## 2. The '137 Patent

The '137 patent describes "a system and method which allows consumer users to establish self-imposed limits on the user's spending (borrowing) such that when the limit is reached the consuming user is notified." ('137 patent, 1:65-2:1) There are four independent claims, two system claims and two method claims. Representative independent claim 12 recites:

12. A method comprising:
   storing, in a database, a profile keyed to a user identity and containing one or more user-selected categories to track transactions associated with said user identity, wherein individual user-selected categories include a user pre-set limit; and
   causing communication, over a communication medium and to a receiving device, of transaction summary data in the database for at least one of the one or more user selected categories, said transaction summary data containing said at least one user-selected category's user pre-set limit, and wherein said transaction summary data is configured to be presented by the receiving device in a table.

('137 patent, 9:50-59; 10:4-15, 36-49)

Using the framework set forth in *Alice*, the court first determines the central idea of the patent. Plaintiffs argue that the '137 patent "discloses and claims a specific application of administering financial accounts[, or] a practical application of the broader idea of electronically administering financial accounts using computer and database technology." (D.I. 18 at 8) However, the core idea of the patent is allowing users to set self-imposed limits on their spending and receive notifications regarding such limits, i.e., setting up a budget and tracking their spending. Budgeting is a longstanding and

11

fundamental practice, utilized in personal and business finances.

In the second step of the *Alice* framework, the court examines whether the claims are limited by an "inventive concept" such that "the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice Corp.*, 134 S.Ct. at 2355. The steps of independent claims 1, 5, and 12 are: (1) storing a user profile, which contains at least one user-selected category with a user pre-set limit; and (2) presenting or communicating "transaction summary data" for such category and limit. Claim 12 also requires that the "transaction summary data" be configured in a table. Claim 19 requires: (1) listing the financial transactions in categories from a certain time period; and (2) presenting the amount of such transactions in categories together with the user-identified limit. Plaintiffs conclude that these limitations "create a practical way of self-monitoring financial accounts using computer generated automatic updates." (D.I. 18 at 9-10) The steps of storing data from a user, listing data, and presenting summary data (configured in a table), however, are ways "to implement the abstract idea with routine and conventional [computer] activity." *Ultramercial*, 2014 WL 5904902, at *5; *Fuzzysharp Techs. Inc. v. 3DLabs Inc., Ltd.*, 447 F. App'x 182, 185 (Fed. Cir. 2011) (computing and storing data are "functions . . . essentially synonymous with the term "computer" and thus add little or nothing to simply claiming the use of a general purpose computer").

Plaintiffs also argue that "[t]he concept of having your bank automatically notify you concerning your pre-set limits was inventive and not abstract." (D.I. 18 at 9) But an automatic notification is an implementation of a conventional step (users comparing amounts spent with their chosen limit) on a computer (or via the Internet). As the

12

Supreme Court has stated, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. Stating an abstract idea while adding the words 'apply it' is not enough for patent eligibility." *Alice*, 134 S.Ct. at 2358. The Internet is described in the specification as being used to send the notification message ('137 patent, 2:5-6), change the limits (*id*. at 2:24-26), access the account (*id*. at 2:45-48), and communicate with a third party (*id*. at 4:19-21). For each of these uses, the specification also describes other methods, such as telephone or email. Unlike the claims in *DDR Holdings*, where "the claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks," the claims at bar "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *DDR Holdings,* 2014 WL 6845152 at *10.

As to the type of technology used to implement the claims, plaintiffs argue that: "a computer is used in a specific way to perform the claims and implements the integral steps of setting, storing, monitoring the limits and restrictions and alerting the user based on the data;" practicing the invention without a computer is impossible, because it would require too much manpower and overhead for bank personnel; and, "[w]hile a general computer database was well known or generic, using a specially programmed database in the way claimed by the '1[3]7 patent was not generic or known at the time." (D.I. 18 at 11) These arguments fail under the *Alice* framework for analyzing § 101 issues. That the abstract idea implemented on a computer allows for more or faster monitoring of accounts is not the crux of the patentability analysis. *See SiRF Tech., Inc.*

13

*v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010) ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.").

The computer and components (central processor) described in the specification are generic.[5] The database is also generic; the specification does not describe a "specially programmed database," but a database used to store data: "Processor 15, in conjunction with database 16 and profiles 17, then categorizes the various purchases being made and stores those purchase amounts and categories in database 16, according to profiles of user 17, as stored, for example, in profile data[]base 17." ('137 patent, 3:47-52) The patent describes the "auxiliary database 16-1" as holding any type of information. (*Id.* at 4:59-5:2) While plaintiffs argue that the claims use "computer implemented algorithms" as a meaningful and specific use of technology, there are no algorithms described in the claims. Instead, as discussed above, the claims are directed to generic computing functions such as storing and processing data.

The Supreme Court has explained that,

---

[5]Describing a user "utilizing keyboard 22 and computer 23 to access his or her account via communication links 201-1 and 210-2 and public network 24 to web portal or phone operator 25." The "computer 23 . . . could be a telephone, pager, PDA, or the like . . . ." The communication links are "pager network, cellular network or any other type of network, including for example, wireless, wire line or the cable satellite network typically utilized for broadcast signals into the home for entertainment purposes." ('137 patent, 5:48-63) The specification also references a "central processor" used to catagorize purchases, communicate, controlling the acceptance of a purchase, send data. ('137 patent, 3:47, 56; 4:24-26, 43-45)

14

> what petitioner characterizes as specific hardware—a "data processing
> system" with a "communications controller" and "data storage unit," . . . is
> purely functional and generic. Nearly every computer will include a
> "communications controller" and "data storage unit" capable of performing
> the basic calculation, storage, and transmission functions required by the
> method claims. *See* 717 F.3d, at 1290 (Lourie, J., concurring). As a
> result, none of the hardware recited by the system claims "offers a
> meaningful limitation beyond generally linking 'the use of the [method] to a
> particular technological environment,' that is, implementation via
> computers." *Id.*, at 1291 (quoting *Bilski*, 561 U.S., at 610–611, 130 S.Ct.
> 3218).

134 S.Ct. at 2360. That the system of claim 1 at bar recites a "means for storing" and a

"means for presenting transaction summary data," and claim 19 recites a "means for

listing," does not change the analysis, as only generic computers and components are

disclosed in the specification. *See In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (in

analyzing means-plus-function claims, finding that "the functions of 'processing,'

'receiving,' and 'storing' are coextensive with the structure disclosed, i.e., a general

purpose processor," such "functions can be achieved by any general purpose computer

without special programming").

Dependent claims 2, 4 6, 8, 13, 15 further define certain of the user-selected

categories. Any changes to the definition of the categories are changes to data entered

by the user. Dependent claims 7 and 14 add a method step of assigning purchasable

items to a category. Dependent claim 3 adds a "means for assigning" items to a

category. Dependent claim 19 adds a "means for presenting" a profile. Dependent

claim 21 adds a "means for accepting" changes to categories and a "means for causing

storage" of such changes. Dependent claims 22 and 23 add a "means for listing"

additional data. Dependent claim 24 adds a "means for allowing" a user to change

certain categories. Using the same analysis as above, each of these "means" are

15

limited to the generic computer and components disclosed in the specification.
Dependent claims 9-11 and 16-18 define the communication medium, as "network,"
"wireless," or "cellular." The dependent claims do not further restrict the independent
claims in such a way that the "abstract idea" is meaningfully limited.

In this regard, the inquiry on preemption is whether the patent "would risk
disproportionately tying up the use of the underlying ideas." *Alice*, 134 S.Ct. at 2354.
Plaintiffs argue that the '137 patent does not preempt the broader concept of managing
financial accounts, as the claims provide specific algorithms to monitor the data and
alert the user. The court concludes that the claims are not directed to specific
algorithms, instead implementing the conventional concept of budgeting on general
computers. As such, the patent would tie up the abstract idea of budgeting and,
therefore, is invalid for lack of patentable subject matter.[6]

### 3. The '382 Patent

The '382 patent describes "a system for selectively tailoring information delivered
to an Internet user depending upon the particular needs of the user." ('382 patent,
1:17-19) The specification explains that the standard Internet use results in a Web
page "appear[ing] identical[ly] to each information user," with "no tailoring of information
to each information user." (*Id*. at 3:10-12) The system of the patent purports to
address "current problems with the Internet" by allowing a user to create "a detailed
standard profile . . . having a[] tremendous amount of detail and [then] selectivity [use]

---

[6]The court's conclusion is consistent with *Intellectual Ventures I LLC v. Capital
One Financial Corp.*, Civ. No. 13-740, 2014 WL 1513273 (E.D. Va. April 16, 2014)
("*Capital One*"), where the district court concluded that the '137 patent was invalid for
lack of patentable subject matter.

16

this profile . . . with any information provider that accepts the standard format." (*Id*. at 1:44; 4:22-26) Multiple profiles may be created. (*Id*. at 3:50-53, 59-65) The "profile is stored in a computer memory (not shown) and transferred to an information provider . . . when a [w]eb page is accessed." (*Id*. at 4:10-13) "This system allows the information provider to selectively provide information to the information user without the information user's knowledge or without irking the information user by telling them they need a password, or they need to be a member." (*Id*. at 6:39-43) "[A] company [may] tailor the delivery of information to a specific user," based on the profile. "The web page manager selects [the] most appropriate data streams for the current information user . . . depending upon the currently available data streams and the profile of the individual." (*Id*. at 6:19-33) This results in "a virtual panoply of information which is placed in a mosaic most pleasing to the information users." (*Id*. at 4:30-31) The specification also describes that "[t]he system includes an interactive interface which provides a medium for information users to communicate with information providers." (*Id*. at 2:6-9) The four independent claims consist of one system claim and three method claims. As an example, independent claim 21 discloses:

21. A method comprising:
   receiving data from a user profile associated with a user;
   in response to a request associated with the user, sending a data stream that is selected based at least in part on the received data from the user profile; and
   displaying the data stream via an interactive interface, the interactive interface comprising:
   a display depicting portions of a web site visited by the user as a function of web site navigation data; and
   a display depicting portions of a web site visited by the user based at least in part on the received data from the user profile.

17

(*Id*. at 7:13-22, 53-59; 8:18-32, 43-54)

Following the *Alice* framework, the parties generally agree that the central idea of the claims is providing a customized web page with content based on the user's profile and website navigation history. Claims 1, 16, and 21 may be broken down to some or all of the following steps: (1) receiving data from a user profile; (2) storing such data; and (3) using such data to display a web page via an interactive interface where the display contains content based on a user's navigation data and content based on a user's personal characteristics. Claim 7 uses "data streams" and consists of: (1) generating data streams (which are matched to a profile) where each data stream is associated with a portion of the web page and stored in memory; and (2) changing the portions of the web page with time. Defendants argue that such an idea is "abstract and non-inventive."

The Federal Circuit, applying step two of the *Alice* framework, explained in *DDR Holdings* that, in order for claims addressing "Internet-centric challenges" to be patent eligible, the claims must do more than "recite a commonplace business method aimed at processing business information [or] applying a known business process to the particular technological environment of the Internet . . . ." 2014 WL 6845152 at *12. Instead of working in a "normal, expected manner," the '382 patent describes an idea and solution for customized web page content, thus, "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id*. at *10, 12.

The claims do not preempt all applications of providing customized web pages,

as they recite a specific method of customizing web pages based on user data.[7] The

court concludes that the '382 patent passes muster under the *Alice* framework and

recites patentable subject matter.

### 4. The '587 Patent

The '587 patent is directed to "a method, system and apparatus for automatically

organizing a large number of images that may be obtained from a variety of different

sources." ('587 patent, 1:4-7) The specification explains that "if the hardcopy prints are

organized in groups (categories) by the customer prior to scanning, the scanning can

proceed more efficiently and minimize further organization down the line thus

significantly reducing the cost to organize the images." (*Id.* at 3:52-56) There are three

independent method claims. Claim 18 recites:

18. A method of automatically organizing digital images obtained from a
plurality of hard copy prints, comprising the steps of:
    obtaining hard copy prints from a plurality of different sources, each
of said hard copy prints having an image thereon;
    digitally scanning a plurality of hard copy prints each having an
image thereon wherein said plurality of hard copy prints have been
grouped together into one or more categories, each category being
associated with an instruction form to create digital image files of said
images and obtaining associated category information for said digital
images in accordance with said machine readable instruction executed by
a computer;
    automatically grouping said digital image files into said categories
in accordance with said instruction; and
    storing the digital image files and said associated category on a
digital storage medium.

---

[7]Although the court recognizes that defendants raise concerns regarding
enablement and indefiniteness in that the '382 patent does not describe any hardware
or software, those issues are not before the court instantly. (D.I. 17 at 14, n.16); *see
also Capital One*, 2014 WL 1513273, at *4-6 & n.11 (finding a number of limitations
indefinite and the '382 patent insolubly ambiguous in violation of § 112(b)).

19

(*Id*. at 20:13-29, 20:49-64; 21:17-22:17)

The first step of the *Alice* framework directs the court to determine whether the patent is directed to an "abstract idea;" here, scanning groups of images and organizing them. This is akin to a computerized photo album, a routine and conventional idea. The court turns to step two in the *Alice* framework and the search for an "inventive concept" such that the patent meaningfully limits the "abstract idea." The independent claims consist of some or all of the following steps: (1) obtaining hard-copy images from different sources, organized into groups; (2) scanning the hard-copy images (associated with certain information) which have been sorted into groups; (3) categorizing the scanned images into the same groups as the hard-copy images; (4) storing the groups of scanned images (and associated information); and (5) producing products with one or more images. These individual elements describe the steps used to computerize a known idea, e.g., a photo album or organized photo storage. The specification discloses the following computer technology: an "automatic scanner"[8] ('587 patent, 1:48; 13:5) and a "central computer" (*id*. at 13:5-6), which may be associated with a server hooked up to the Internet (*id*. at 13:40-49). While the independent claims each recite "scanning a plurality of hard copy prints," the scanner does not place a meaningful limit on the scope of the claims. Instead, it is a computer component used to obtain the digital images needed to practice the claimed method. The specification explains that the "images . . . may be obtained from a variety of

---

[8]"An automatic scanner such as described in co-pending U.S. Ser. No. 09/641,103 now U.S. Pat. No. 6,785,024, filed concurrently herewith entitled 'Digital Scanner,' of Kenneth D. Corby et al. which is hereby incorporated by reference." ('587 patent, 1:48-52)

different sources" and may be "obtained from other digital memory devices having digital images." (*Id.* at 1:36-37; 4:17-18)  The focus of the claims is not the use of a "scanner," but the method of organizing digital photos. *Cf. SiRF Technology, Inc. v. International Trade Com'n*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010) (finding that "[a] GPS receiver is a machine and is integral to each of the claims at issue" and "the presence of the GPS receiver in the claims places a meaningful limit on the scope of the claims.").  The specification also references a "central computer" used for various functions including "obtaining of the digital record file for each of the images," "coordinating of the images," and associating codes with images.  ('587 patent, 13:5-6, 13, 34-36)  "[A]ppropriate algorithms (software programs)"[9] may be provided to the customers to use with the images and "any appropriate software program for organizing and/or reorganizing images may be appropriately used." (*Id.* at 16:26-34)  The ordered combination of elements in the claims describe using a computer to store the images and produce products using the images according to a customer's request.  The claims do no more than "computerize" a known idea for organizing images.

The dependent claims add no meaningful limitations.  Dependent claims 2, 3, and 5 describe the type of product produced in the last step.  Dependent claim 4 describes storage on a CD.  Dependent claim 6 adds the limitation "providing instructions on said machine readable instruction form relating to said ordering of said product."  Dependent claims 7 and 8 further describe the information contained in the instruction.  Dependent claim 9 adds the limitation "providing a product or service

---

[9]The specification incorporates by reference two patents describing organizational software.  ('597 patent, 16:2-5, 26-33)

21

created from said at least one of the plurality of modified digital image files."

Dependent claim 11 recites using a computer to access the digital images. Dependent claim 12 adds the step of "providing at least one good and/or service in accordance with said instructions." Dependent claims 13-16 further define the instruction. Dependent claim 17 requires "searching said images using said information provided on said instruction form." The additional limitations place additional limitations on the products or instructions, which do not meaningfully limit the claims in a fashion such as to limit the "abstract idea."

As to preemption, the claims as written would substantially preempt the creation of digital photo albums or storage, the abstract idea. The '587 patent is directed to patent ineligible subject matter.

### 5. The '701 Patent

The '701 patent "relates to electronic purchases while maintaining privacy of customer billing data." ('701 patent, 1:17-19) The specification explains that "a customer is able to establish accounts with web sites without revealing private billing information such as credit card numbers . . . to a web site/business from whom the customer purchases goods." (Id. at 2:43-48) The patent describes using a "billing service [to] facilitate[] commercial transactions by generating substitute billing data that the client . . . can use when engaging in commercial transactions . . . ." "Substitute billing data" is "valid billing data that is owned and/or controlled by the billing service . . . [and] temporarily or permanently distributed to clients . . . to replace personal and/or private billing data of the client." (Id. at 3:8-16) There are five independent claims – two method claims, two apparatus claims, and one article of manufacture claim.

22

Representative independent claims recite:

> 1.  A method for a user to provide substitute billing data in lieu of personal billing data, comprising:
>         an electronic device facilitating a request to a billing service for first and second distinct credit card numbers, including identifying each business with which the first and second distinct credit card numbers are to be used;
>         the electronic device obtaining the first and second distinct credit card numbers from the billing service for use by the user as a substitute for said personal billing data, the first and second distinct credit card numbers associated with each said business by the billing service;
>         the electronic device facilitating one or more purchasing transactions with a first associated business using the first credit card number; and
>         the electronic device facilitating one or more purchasing transactions with a second associated business using the second credit card number.

> 5.  A method comprising:
>         a billing service registering a user;
>         the billing service receiving identification of a first and a second business with which the user intends to conduct one or more purchasing transactions;
>         the billing service associating a first and a second billing data, that are separate and distinct, with the first and the second business respectively; and
>         the billing service providing the first and second billing data for use by the user as substitutes for personal billing data for subsequent purchasing transactions.

(*Id*. at 8:44-62; 9:24-34)

Applying the first step of the *Alice* framework, the court determines that the '701

patent's central idea is "providing a user with aliases to use in conducting transactions."

The use of the aliases in the patented invention is directed at online purchases.

However, "the claimed solution is [not] necessarily rooted in computer technology in

order to overcome a problem specifically arising in the realm of computer networks."[10]

---

[10]Indeed, claim 5 does not require a computer or electronic device.

23

*DDR Holdings*, 2014 WL 6845152 at *10. The use of aliases to maintain privacy in financial transactions is not limited to Internet transactions, indeed, theft of credit cards and other financial information occurred before the Internet. The court concludes that the '701 patent is directed at an "abstract idea."

Step two of the *Alice* framework requires analyzing the claims for an inventive concept or meaningful limitations. The independent claims involve the following steps: (1) identifying two businesses; (2) associating an alias with billing data or credit card numbers for each business; (3) giving the aliases to the user; and (4) using the aliases to make purchases. Claim 1 recites an "electronic device" used to make requests as well as receive and send data, and claim 10 is an apparatus with "a storage medium" and "a processor." The specification explains that the clients and businesses communicate with a billing service via the network (the Internet). ('701 patent, 3:3-4; 4:10-17; 8:3-4) The specification describes "[a]pparatuses, such as computing devices,[11] and consumer electronic devices such as a telephone," and explains that "the client comprises a computing device, such as a personal computer . . . . [or] may be incorporated into an electronic card, a telephone . . . , a personal digital assistant . . . , a portable audio device, a portable audiovisual device, a cellular telephone, a key-chain dongle, or within an automobile or other transportation device." (*Id*. at 2:17-19, 55-63) Client storage may be on a "separate computing device," which could be "a handheld ('palmtop') personal computer executing the Microsoft Windows operating

_____

[11]Describing a computing system made up generic computing components: "system bus," "processors," "a memory," "storage devices," "a video interface," and "input/output interface ports." ('701 patent, 7:50-58)

24

system." (*Id*. at 3:58-59; 4:5-7) The specification also references "remote computing devices," which are configured like a computing device. (*Id*. at 8:1, 10-11) The computers and components discussed are not specialized. As to software, the specification mentions "executable instructions" (*id*. at 7:60) and "a communication program through which to engage in the purchasing activity" (*id*. at 4:8-28). The structures for the means-plus-function limitations of independent claim 15[12] are likewise limited to generic computers and components. Moreover, the claims are written in broad language and could be practiced with minimal use of or no computer. As noted, claim 5 does not recite a computer or other electronic device.

As the Federal Circuit explained in *DDR Holdings*, in order to pass muster under § 101, it is no longer sufficient to use the Internet through generic computer components to achieve a useful result. The "inventive concept" required under the second step of the *Alice* test must now "specify how interactions with the Internet are manipulated to yield a desired result . . . ." *DDR Holdings*, 2014 WL 6845152 at *12. The claims in *DDR Holdings*, for example, stood apart "because they [did] not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id*. at *10. The claims at issue fall within the former category of patent ineligible claims.

---

[12]"[M]eans for facilitating a request to a billing service," "means for identifying each business," "means for obtaining [credit card numbers] from the billing service," and "means for facilitating one or more purchasing transactions." ('701 patent, 10:25-37)

25

The dependent claims fare no better. Dependent claims 2 and 3 describe the "electronic device" as "a portable digital assistant" and add certain processing steps. Dependent claim 4 adds another step, requiring that "the electronic device notif[y] the billing service." Dependent claims 6 and 11 add two more sets of "billing data." Dependent claim 7 specifies that the billing data is provided in "real time" and the electronic device is used to purchase goods. Dependent claims 8-9, 13-14, and 18 require notification of usage of the billing data. Dependent claim 12 recites that the apparatus is enabled to provide billing data in "real time." Dependent claim 16 adds "means for notifying." These additional limitations likewise do not "ensure that the patent in practice amounts to significantly more than a patent upon" the abstract idea of using aliases to purchase goods. *Alice*, 134 S.Ct. at 2355.

As to preemption, the '701 patent discloses "using aliases to facilitate transactions," but does so on the Internet. Allowing the claims to survive would tie up any innovation related to using aliases to purchase goods on the Internet, which would, in turn, monopolize the "abstract idea." *Alice*, 134 S.Ct. at 2358 (citations omitted) ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment.") The patent is not directed to patentable subject matter.

## VI. CONCLUSION

For the aforementioned reasons, defendant's motion to dismiss (D.I. 16) is granted in part and denied in part. An appropriate order shall issue.

26